**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PHILLIP FREDERICK, et al.,** | : | |
| **Plaintiffs** | : | **No. 1:13-cv-0661** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **ANTHONY BARBUSH,** | : | |
| **Defendant** | : | |

**MEMORANDUM**

Before the Court is Defendant Anthony Barbush's motion for summary judgment.  (Doc.

No. 43.)  The motion has been fully briefed and is ripe for disposition.  For the reasons that

follow, the Court will grant Defendant's motion.

I.    **BACKGROUND**[1]

This case concerns three Plaintiffs' separation from their employment with the

Legislative Security Office of the Pennsylvania House of Representatives ("the House").

Plaintiff Frederick and Plaintiff Meskunas allege that they were forced out of their positions as

Director and Assistant Director of security following allegations that they were responsible for

concealing the criminal record of Plaintiff Marhon, who alleges that he was wrongfully

terminated.  (Doc. Nos. 43-3 ¶¶ 1-9, 51 ¶¶ 1-9.)

Defendant Anthony Barbush was employed at all relevant times as the Chief Clerk of the

House, and in that capacity was ultimately responsible for the personnel within the security

force.  (Doc. Nos. 43-3 ¶¶ 1-9, 51 ¶¶ 1-9.)  Plaintiff Philip Frederick served in multiple

---

[1] The following facts, taken from Defendant's statement of material facts (Doc. No. 43-3), are undisputed, unless otherwise noted.  Defendant's statement of material facts contains specific citations to the record at each numbered paragraph.

1

capacities with the House starting in 1999, becoming Sergeant-at-Arms in 2007.  (Doc. No. 43-3 ¶¶ 3-4.)  Plaintiff Frederick supervised Plaintiff Michael Meskunas, who was the Acting Assistant Director of Operations of Uniformed Forces at the House at the time of his resignation. (Id. ¶ 6.)  Plaintiff Meskunas in turn supervised Plaintiff Brian Marhon, the Legislative Security Officer whose criminal record catalyzed these events.  (Id. ¶¶ 8-9.)

Plaintiff alleges that the genesis of the terminations at issue is the 2006 policy change by the legislative committee responsible for House security, permitting security officers to carry firearms in the scope of their employment.  (Doc. Nos. 43-4 ¶ 16; 51 ¶ 16.)  In connection with that change, Plaintiff Frederick drafted a new code of conduct which required security officers to report any criminal investigations into their personal activities to their supervisors, and stipulated that "[a] conviction for violation of any law, other than a traffic infractions [sic], shall constitute prima facie evidence of a violation of this directive."  (Doc. Nos. 43-3 ¶¶ 17-20, 51 ¶¶ 17-20.) In addition, the code of conduct instructed that "[s]upervisory personnel are responsible for subordinates' adherence to House, CORE, and Departmental rules, regulations, policy, orders, directives and procedures."  (Doc. Nos. 43-3 ¶ 18, 51 ¶ 18.)

On April 20, 2012, Defendant Barbush received an anonymous e-mail detailing Plaintiff Marhon's criminal past, with the subject line, "Criminals within the House of Reps. Security Team."  (Doc. Nos. 43-3 ¶ 21; 43-12 at 2; 51 ¶ 21.)  According to the e-mail and supporting state court documentation, Plaintiff Marhon received convictions in 1994 for simple assault and reckless endangerment before he was employed by the House.  (Doc. No. 43-3 ¶ 23.)  In addition, after Plaintiff Marhon joined the House security force in 2001, he pleaded guilty to driving under the influence of alcohol in 2004, and to simple assault and harassment in 2008.

2

(Doc. Nos. 43-3 ¶ 23; 43-12; 43-13; 43-14.)  There is no evidence that Plaintiff Marhon's

criminal history extends more recently than 2008, even though this history was not revealed until

2012.

After receiving the anonymous e-mail, Defendant called Plaintiff Frederick into his office

to discuss the matter.  (Doc. Nos. 43-3 ¶ 24, 51 ¶ 24.)  The statements made during the meeting

are disputed.[3]  The parties agree, however, that Plaintiff Frederick knew of Plaintiff Marhon's

criminal history and never reported the same to Defendant until asked directly at the meeting.

(Doc. Nos. 43-3 ¶ 24; 51 ¶ 24.)  The parties also agree that Defendant decided that it was

necessary to terminate Plaintiff Marhon's employment.  (Doc. Nos. 43-3 ¶¶ 30-32; 51 ¶¶ 30-32.)

### A.    Plaintiff Marhon

After Defendant and Plaintiff Frederick met with a professional from the human

resources department, the human resources department drafted a letter terminating Plaintiff

Marhon's employment effective April 25, 2012.  (Doc. No. 43-3 ¶¶ 33-35; 51 ¶¶ 33-35.)

According to the termination letter, the House terminated Plaintiff Marhon "due to [his] criminal

history during [his] employment with the House of Representatives[.]"  (Doc. No. 43-15.)

However, the parties dispute Defendant's reasons for insisting upon Plaintiff Marhon's

---

[3] Specifically, Defendant testified that Plaintiff Frederick admitted to lying in response to questions weeks earlier from Defendant about "problems in the department," while Plaintiff Frederick testified that he never made such an admission, and that Defendant's questions had been ambiguous.  (Doc. Nos. 43-3 ¶¶ 24-27; 51 ¶¶ 24-27.)  According to Plaintiff Frederick, at the meeting Defendant also instructed Plaintiff Frederick to terminate Plaintiff Marhon, and Defendant insisted on not complying with established investigation procedures prior to Plaintiff Marhon's termination, even over Plaintiff Frederick's objection.  (Doc. No. 51 ¶¶ 24-26.)  Plaintiff Frederick also claims that Defendant accused him and others of "covering up" Plaintiff Marhon's criminal past.  (Id.)  At this juncture, the Court resolves factual disputes in favor of the non-moving party, here Plaintiffs.

termination.  According to Defendant's deposition, Defendant decided to terminate Plaintiff

Marhon because his criminal history "posed a safety risk" to the House, "especially given that he

carried a weapon," and because his criminal history posed a public relations problem for the

organization.  (Doc. No. 43-3 ¶¶ 30-32.)  Plaintiffs contest Defendant's stated motives, because

even if sincerely held, Plaintiffs argue that they were uninformed and unreasonable, and hence

unconstitutionally arbitrary, given the lack of investigation and Plaintiff Marhon's otherwise

incident-free employment history with the House.  (Doc. No. 51 ¶¶ 30-32.)

### B.    Plaintiff Frederick

It is undisputed that at the initial meeting after Defendant received the anonymous e-mail,

Defendant learned that Plaintiff Frederick had been aware of Plaintiff Marhon's criminal history

and had not disclosed it; the parties dispute whether or not Defendant accused Plaintiff Frederick

of "covering up" Plaintiff Marhon's criminal past.  (Doc. Nos. 43-3 ¶¶ 24-26; 51 ¶¶ 24-46.)

Subsequently, Defendant informed Plaintiff Frederick in a telephone call that the legislative

committee responsible for the security services "no longer [had] trust and confidence" in

Plaintiff Frederick's ability to supervise his department.  (Doc. Nos. 43-3 ¶ 29; 51 ¶ 29.)

Plaintiff Frederick and Defendant met again on April 25, 2012, this time with intermediate

supervisors who reported to Plaintiff Frederick.  (Doc. Nos. 43-3 ¶¶ 36-38; 51 ¶¶ 36-38.)  At this

meeting, Defendant reiterated his accusations that Plaintiff Frederick "covered up" Plaintiff

Marhon's record, threatened to disband the armed security force altogether, and directed Plaintiff

Frederick to withdraw the firearms from the legislative security officers.[4]  (Doc. Nos. 43-3 ¶¶ 36-

---

[4] Plaintiffs' account of this meeting is more detailed than that of Defendant, and the Court accepts Plaintiffs' version, supported by deposition testimony, as true for the purposes of this motion only.

4

38; 50-3 at 23; 51 ¶¶ 36-38.)  Thereafter, the Director of Human Resources instructed Plaintiff

Frederick that he would soon be terminated.[5]  (See Doc. No. 43-5 at 24.)  In the wake of these

events, Plaintiff Frederick prepared and tendered a resignation letter, and he retired from the

House's employ effective May 15, 2012.  (Doc. Nos. 43-16; 43-17.)  Defendant characterizes

Plaintiff Frederick's resignation as a retirement (Doc. No. 43-4 ¶¶ 38-39), while Plaintiffs

advance the theory that Plaintiff Frederick was forced from his position (Doc. No. 51 ¶¶ 38-39).


### C.      Plaintiff Meskunas

Plaintiff Meskunas, who had some contact with Plaintiff Marhon outside of their

employment, learned of Plaintiff Marhon's 2008 legal troubles soon after they occurred.  (Doc.

Nos. 43-3 ¶¶ 10-13, 49; 51 ¶¶ 10-13, 49.)  Plaintiff Meskunas directly supervised Plaintiff

Marhon for the duration of Plaintiff Marhon's employment with the House.  (Doc. Nos. 43-3 ¶

13; 51 ¶ 13.)

At some point after Defendant received the anonymous e-mail, Plaintiff Meskunas was

present for a meeting with Defendant and with another intermediate supervisor.  (Doc. Nos. 43-3

¶ 35; 51 ¶ 35.)  Plaintiff Meskunas admitted to Defendant that he, too, had knowledge of Plaintiff

Marhon's criminal record but had never reported it directly to Defendant.  (Doc. Nos. 43-3 ¶ 35;

51 ¶ 35.)  Plaintiff Meskunas did report Plaintiff Marhon's legal trouble to Plaintiff Frederick as

it occurred, and Plaintiff Meskunas informed Defendant of that communication.  (Doc. No. 43-3

---

[5] Defendant has raised a hearsay argument with respect to the Director of Human Resources' statement, however, the Court observes preliminarily that Plaintiff Frederick offers the statement not for its truth, but for its effect on the listener, so the Court will consider the statement at this juncture.  See Fed. R. Evid. 801(c).

¶ 51.)  Defendant, either personally or through another employee, offered Plaintiff Meskunas the

opportunity to resign in lieu of termination.  (Doc. Nos. 43-3 ¶¶ 51-53; 51 ¶¶ 51-53.)  Plaintiff

Meskunas tendered his resignation on May 20, 2012, effective May 29, 2012.  (Doc. No. 43-21)

("As per [Defendant's] order, this letter is to serve as my [Plaintiff Meskunas'] resignation,

under duress of termination.")

> **D.    Other House employees**

Plaintiffs have identified other individuals who they claim were similarly situated in that

they were aware of Marhon's criminal record, and failed to reveal it until after the anonymous e-

mail arrived and the events surrounding this case began in earnest.  (Doc. Nos. 15 at 29; 43-4 at

40).  According to Plaintiffs, Mr. Hal Roach and Mr. Carl Barnhardt experienced different

employment outcomes than Plaintiffs despite their similarities: Mr. Barnhardt was promoted to

Plaintiff Frederick's vacant position before ultimately resigning, and Mr. Roach remains in the

House's employ.  (Doc. No. 50 at 16.)

> **E.    Procedural history**

Plaintiffs initiated the above-captioned action on March 12, 2013, invoking this Court's

federal question jurisdiction.  (Doc. No. 1.)  Upon Defendant's earlier motion, the Court

dismissed Plaintiffs' Due Process, wrongful discharge, and promissory estoppel claims (Doc.

No. 26) (Conner, J.), and Plaintiffs filed an amended complaint on March 24, 2014 (Doc. No.

29).  In its amended form, Plaintiffs' complaint raises claims under the Equal Protection Clause

of the Fourteenth Amendment to the United States Constitution only.  (Doc. No. 29.)  Defendant

has moved for summary judgment on all remaining counts.[6]

## II.   LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  Id. at 251-52.  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party "fails

---

[6] This case was initially assigned to Chief Judge Conner, however, after entering an order on Defendant's motion to dismiss (Doc. No. 26), Judge Conner entered an Order of Recusal and the case was reassigned (Doc. No. 41).

to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden at trial," summary judgment is warranted.

<u>Celotex</u>, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving

party must provide, a court should grant a motion for summary judgment when the non-movant's

evidence is merely colorable, conclusory, or speculative.  <u>Anderson</u>, 477 U.S. at 249-50.  There

must be more than a scintilla of evidence supporting the non-moving party and more than some

metaphysical doubt as to the material facts.  <u>Id.</u> at 252; <u>see also</u> <u>Matsushita Elec. Indus. Co. v.</u>

<u>Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  Further, a party may not defeat a motion for

summary judgment with evidence that would not be admissible at trial.  <u>Pamintuan v. Nanticoke</u>

<u>Mem'l Hosp.</u>, 192 F.3d 378, 387 (3d Cir. 1999).

## III.    DISCUSSION

Plaintiffs each bring a Section 1983 equal protection claim for selective enforcement

against Defendant, and Defendant has moved for summary judgment as to each Plaintiff's claim.

First, the Court finds that Plaintiffs' claims fall under the "class of one" theory, and are therefore

prohibited by <u>Engquist v. Ore. Dept. Of Agric.</u>, 553 U.S. 591 (2008).  Plaintiffs' claims also fail

because there is no evidence in the record indicating that a policy or law was enforced against

them.

### A.    Plaintiffs claims fall under the "class of one" theory

Plaintiffs' claims fall squarely within the strictures of <u>Engquist v. Ore. Dept. Of Agric.</u>,

553 U.S. 591 (2008).  In <u>Engquist</u>, the United States Supreme Court held that "class of one"

equal protection claims were unavailable to plaintiffs in the public employment context.  553

U.S. 591, 609 (2008).  According to the majority, "we have never found the Equal Protection

Clause implicated in the specific circumstance where, as here, government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner." Id. at 605.  According to the Engquist majority, if plaintiffs do not make an allegation of class-based discrimination, but instead argue "only that they were treated by their employers worse than other employees similarly situated," then "any personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal claim." Id. at 607-608.  Finding that "constitutionaliz[ing] the employee grievance" would undermine prevailing notions of at-will employment, and observing that public sector employees' rights are vindicated by a variety of federal, state, and local legislative enactments, the Court held that "[p]ublic employees typically have a variety of protections from just the sort of personnel actions about which [the plaintiff] complains, but the Equal Protection Clause is not one of them." Id. at 607-609.

Plaintiffs argue that Engquist's holding is explicitly limited to the "class of one" theory, 553 U.S. at 609, and that in evaluating Defendant's motion to dismiss the original complaint, Judge Conner construed Plaintiffs' claims as brought according to a selective enforcement theory (Doc. No. 25 at 20-21).  However, the distinction between those two theories in cases like this one, where Plaintiffs do not claim to be members of any class, is semantic only.[7]  Upon briefing

---

[7] Many courts have suggested that any equal protection claim brought by an individual alleging discrimination that is not based on class membership is a "class of one" claim. See e.g., Reget v. City of La Crosse, 595 F.3d 691, 695 (7th Cir. 2010) ("The Equal Protection Clause of the Fourteenth Amendment prohibits state action that discriminates on the basis of membership in a protected class or irrationally targets an individual for discriminatory treatment as a so-called 'class of one.'"); Germalic v. Aichele, No. 12-2100, 2012 WL 5299836, at *1 (M.D. Pa. Oct. 25, 2012) (Rambo, J.); Hookey v. Dalton, No. 08-2284, 2010 WL 4237310, at **4-5 (M.D. Pa. Oct. 21, 2010) (Rambo, J.); M & M Stone Co. v. Hornberger, No. 07-4784, 2009 WL 3245460, at *14 (E.D. Pa. Sept. 30, 2009) ("Plaintiff is not a member of a protected class and

and further factual development, the Court finds that Plaintiffs' equal protection claims are properly characterized as "class of one" claims.  It is plain from the now fully developed factual record that there exists no evidence to support a finding that Plaintiffs were members of any class.

The United States Court of Appeals for the Third Circuit has described a "class of one" claim as one where a litigant asserts "that the litigant itself, and not a particular group, was the subject of discriminatory treatment under a particular law." PG Pub. Co. v. Aichele, 705 F.3d 91, 114 (3d Cir. 2013).  In such cases, the Third Circuit requires "the litigant to allege 'that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'"  Id. (quoting Marcavage v. Nat'l Park Serv., 666 F.3d 856, 860 (3d Cir. 2012)).  Plaintiffs here allege that they received worse treatment than other similarly situated individuals because Defendant "developed resentment and malice" for Plaintiffs, and because employment decisions based on malice lack a rational basis.  (Doc. No. 29 at 63.)  They make no reference to class-based distinctions, except to mention in passing that two members of suspect classes received better treatment than Plaintiffs received.  (Doc. No. 29 ¶ 75) ("It is also believed, and therefore averred, that Mr. Archie and Ms. Summey were treated differently (and substantially better) than Mr. Frederick because they belong to minorities – Mr. Archie is African-American and Ms. Summey is a woman.") (parenthesis in original).  The gravamen of Plaintiffs' argument is that Defendant, motivated by spite incited by Plaintiffs' cover up of Plaintiff Marhon's criminal record and by Plaintiffs' support of equipping legislative

therefore must pursue its Equal Protection claim under a 'class of one' theory.").

security officers with firearms, terminated Plaintiffs' employment without a legitimate

governmental reason to do so.[8]  (See e.g., Doc. No. 50 at 17)[9]  In addition, Plaintiffs do not argue

that those people who were aware of Plaintiff Marhon's criminal history and who failed to

disclose it to Defendant constitute a class, because Plaintiffs argue that members of that group

were "similarly situated," but received better treatment than Plaintiffs received.  (See e.g., Doc.

No. 50 at 16) (citing Doc. No. 43-4 at 31-32, 152-153) ("These individuals were further similarly

situated because [Defendant] was of the opinion that they all lied about [Plaintiff] Marhon's

criminal record.").  In short, Plaintiffs identify no factor outside of Defendant's own allegedly

arbitrary personal feelings towards each Plaintiff that precipitated the end of their employment.

   For the foregoing reasons, the Court finds that Plaintiffs' claims are, in essence, "class of

one" claims brought against a public employer, and Defendant is therefore entitled to summary

judgment on those claims following Engquist v. Ore. Dept. Of Agric., 553 U.S. 591 (2008).

## B.    Selective enforcement

   Plaintiffs' claims would also fail under a selective enforcement analysis because there is

---

[8] Plaintiffs also allege that "[Plaintiff] Marhon was terminated for having a criminal record and failing to bring that record to the attention of Mr. Barbush, which conduct was perceived as a 'cover up' that challenged/threatened the authority of Mr. Barbush."  (Doc. No. 29 ¶ 113).  The discrimination is alleged to be based on Defendant's perception of wrongdoing, a non-class based justification that also does not implicate a fundamental right.  (See id.)  To the extent Plaintiff Marhon's discrimination theory differs from those of Plaintiffs Meskunas and Frederick, the distinction does not alter the Court's analysis, because Plaintiff Marhon alleges that Defendant "made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner."  Engquist v. Ore. Dept. Of Agric., 553 U.S. 591, 605 (2008).

[9] "[T]here is record evidence from which a jury could conclude that [Defendant] harbored feelings of malice or ill intent towards Mr. Frederick . . . . [Defendant] would harp on the 'gun issue' every time he met with [Plaintiff] Frederick[,] [and] the malice and ill-will only intensified when the issue of [Plaintiff] Marhon's criminal record arose."  (Doc. No. 50 at 17); (see e.g., Doc. No. 29 ¶¶ 89-94, 113).

no record evidence of a factual link between the code of conduct and Plaintiffs' employment outcomes. In the Third Circuit, a selective enforcement plaintiff is required to establish "(1) that [it] was treated differently from other similarly situated [entities], and (2) 'that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, ... or to prevent the exercise of a fundamental right.'" PG Pub. Co. v. Aichele, 705 F.3d 91, 115 (3d Cir. 2013) (quoting Dique v. N.J. State Police, 603 F.3d 118, 125 (3d Cir. 2010)). In addition, a plaintiff must show "an element of intentional or purposeful discrimination."[10] Id. (quoting Snowden v. Hughes, 321 U.S. 1, 8 (1944)).

The selective enforcement theory of recovery in civil cases originated in Snowden v. Hughes, 321 U.S. 1, 8 (1944), but Third Circuit's familiar language defining the cause of action in civil cases first appeared in Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993). See

---

[10] In cases where an individual plaintiff alleges discrimination that is not based on class or the exercise of a fundamental right, a selective enforcement claim and a "class of one" claim are different in name only. Compare PG Publishing, 705 F.3d at 115, with id. at 114-115. This is so because when a selective enforcement plaintiff alleges discrimination based on "some other arbitrary factor," that plaintiff is invariably alleging treatment with "no rational basis," and the two standards are otherwise the same. See City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 471 n.23 (1985) ("Only when it can be said that Congress misapprehended what it was doing, will a classification fail the minimal rational-basis standard. Even then, the classification fails . . . because the classification reflects no underlying substantive policy – it is simply arbitrary.") (Marshall, J. concurring). The Court finds that Plaintiffs' claims, even with a selective enforcement moniker, would still fail as a matter of law. At least one district court in the Second Circuit has come to a similar conclusion. See Emmerling v. Town of Richmond, No. 09-6418, 2010 WL 2998911, at *13 (W.D.N.Y. July 27, 2010) ("[T]he Court believes that the rationale of Engquist applies to selective enforcement claims by public employees."). The Second Circuit affirmed, observing that the Second Circuit "has not yet decided whether selective enforcement claims are still viable in the public employment context after [Engquist.]" Emmerling v. Town of Richmond, 434 F. App'x 10, 12 (2d Cir. 2011). The Third Circuit has not addressed the viability of non-class-based selective enforcement claims after Engquist, and given the somewhat open nature of the question, the Court has opted to construe Plaintiffs' claims as "class of one" claims, which are undisputedly barred.

Holder, 987 F.2d at 197 (quoting United States v. Schoolcraft, 879 F.2d 64, 68 (3d Cir. 1989)).

In Holder, a municipal employee of Allentown, Pennsylvania sued the city after it terminated

him for violating an ordinance requiring city employees to live in Allentown – an ordinance the

plaintiff claimed had been selectively enforced against him in retaliation for writing a critical

letter to the editor.  Id. at 191-193.  The district court dismissed Plaintiff's First Amendment

Retaliation claim, holding that "when a city official is carrying out a duty mandated by

municipal law, motive in carrying out the duty is irrelevant."  Id. at 196 (quoting Holder v. City

of Allentown, No. 91-0240, 1992 WL 70404, at *3 (E.D. Pa. March 4, 1993)).  In overruling the

district court, the Third Circuit panel held that "a public official may engage in 'invidious

discrimination among persons or groups either by use of a statute providing a system of broad

discretionary licensing power or, . . . the equivalent of such a system by selective enforcement of

an extremely broad prohibitory statute.'"  Id. at 197 (emphasis and ellipsis in original) (quoting

Cox v. Louisiana, 379 U.S. 536, 557-558 (1965)).  The civil selective enforcement claim derives

from a facially neutral law or policy that has been enforced in a discriminatory manner.  See

Snowden, 321 U.S. at 8 (positing that "[t]he unlawful administration by state officers of a state

statute fair on its face" could constitute an equal protection violation) (emphasis added).  And

Plaintiffs cite no precedent sustaining a selective enforcement claim based on an occupational

code of conduct.  See Majewski v. Fischi, 372 F. App'x 300, 305 (3d Cir. 2010).[11]  Moreover,

---

[11] In Majewski v. Fischi, the Third Circuit considered a selective enforcement claim in
the public employment context after the Supreme Court had announced the Engquist prohibition.
See 372 F. App'x 300, 305.  Majewski is unlike the case at bar, however, because the Majewski
plaintiff claimed discrimination based on his disability (a classification, even if a classification
warranting only rational-basis review), and in retaliation for engaging in protected activities,
rather than for simple malice.  Id.; (see also, Majewski v. Fischi, No. 05-2369, Doc. No. 9 ¶¶ 59-
64).  In any case, the Third Circuit did not address the viability of the claim after Engquist.  Id.

Plaintiffs point to no evidence to suggest that the code of conduct was the basis of the

employment actions of which they now complain.  There is no record evidence that the code was

enforced against them at all, even as a pretense for employment decisions.  The legislative

security code of conduct is not mentioned in Plaintiff Marhon's termination letter (Doc. No. 43-

15), and there is no indication from deposition testimony that the notion of a code of conduct

factored in Defendant's employment decisions related to Plaintiffs.  (Doc. Nos. 43-5 at 34; 43-4

at 32); see Majewski, 372 F. App'x at 305 ("[Plaintiff] offers insufficient evidence that the Code

of Ethics was [selectively] applied . . . .").  In Defendant's deposition, he acknowledges that the

code of conduct was in force at the time that each Plaintiff left the security force, but offers no

indication that the code factored into any employment decision he made.  (Doc. No. 43-4 at

41.)[12]  Further, Plaintiffs never allege that the code of conduct was enforced against them or even

listed as a reason for their departures from the office, and there is no indication that an employee

could only be terminated for violations of the code of conduct rather than for another reason or

for no reason.  (See Doc. Nos. 29; 43-11.)  Deposition evidence indicates that the policy was

adopted "because there was a greater expectation because [legislative security officers] were

carrying firearms and they had a lot more authority than any other house employee."  (Doc. No.

43-5 at 34.)  However, at no point is the code of conduct's relevance to Plaintiffs' employment

outcomes ever established.  Plaintiffs have not established that a policy or regulation was

---

Instead, the Third Circuit made its brief ruling on an evidentiary basis.

[12] Defendant: "[The code of conduct and other internal regulations] are policies and
procedures.  They're not laws.  We have certain leeway as to take things on a case-by-case basis,
as I have described to you.  And that's how we do things, and that's how we'll continue to do
things.  In no case, nothing is black and white."  (Doc. No. 43-4 at 41.)

enforced against them, and the Court finds the lack of a relationship between any established policy and Plaintiffs' e mployment outcomes to be separately dispositive of their claims.  See PG Pub. Co. v. Aichele, 705 F.3d 91, 115 (3d Cir. 2013) ("Appellant must show . . . that the administration of § 3060 has resulted in [unequal treatment]") (emphasis added); see also Holder, 987 F.2d at 197 ("[I]t has long been established that discriminatory enforcement of a statute or law by state and local officials is unconstitutional.") (citing Cox v. Louisiana, 379 U.S. 536 (1965)).  In addition, the Court observes that the absence of a nexus between a true regulation or rule and any disparate treatment further confirms that Plaintiffs' claims fall under a "class of one" theory, and not a selective enforcement theory.  Accordingly, even if  the Court treats Plaintiffs' claims as selective enforcement claims, rather than "class of one" claims, they fail as a matter of law, and Defendant is entitled to summary judgment.

## IV.     CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment and close the case.  An order consistent with this memorandum follows.